# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | |
|---|---|
| PIKE CREEK RECREATIONAL SERVICES, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>NEW CASTLE COUNTY, a Political Subdivision of the State of Delaware,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) C.A. No. N19C-05-238 PRW<br>)<br>)<br>)<br>)<br>)<br>) |

Submitted: August 3, 2020
Decided: August 18, 2020

## OPINION AND ORDER

*Upon Pike Creek Recreational Services, LLC's Motion for Summary Judgment,*
**DENIED.**

*Upon New Castle County's Motion for Summary Judgment,*
**GRANTED.**

David A. White, Esquire, and Matthew J. Rifino, Esquire, MCCARTER & ENGLISH, LLP, Wilmington, Delaware, *Attorneys for Plaintiff Pike Creek Recreational Services, LLC.*

Max B. Walton, Esquire, and Lauren P. Deluca, Esquire, CONNOLLY GALLAGHER, LLP, Newark, Delaware, *Attorneys for Defendant New Castle County.*

WALLACE, J.

For the last six decades, a large swathe of land in New Castle County ("the County"), originally called the Mill Creek Hundred, has been under development as the Pike Creek Valley. Pike Creek Recreational Services, LLC ("PCRS") is the owner of the last remaining significant patch of undeveloped land in the Pike Creek Valley, consisting of 179.28 acres.[1]

The parties are currently involved in other litigation before the undersigned—a consolidated action containing the County's suit in the Court of Chancery and PCRS's mandamus action filed here ("Prior Action").[2] In the course of that case, the Court found that the applicable deed restrictions require setting aside at least 130 acres of PCRS's land designated for a golf course, though did not mandate PCRS actually operate such a course.[3]

Following that ruling, the parties agreed to stay the Prior Action to permit PCRS to develop a mutually acceptable plan for the development of its land.[4] Their attempts foundered, after more than two years, on their irreconcilable interpretations

---

[1] Compl. at ¶ 2 (D.I. 1); Ans. at ¶ 2 (D.I. 3).

[2] *See generally New Castle Cty. v. Pike Creek Recreational Services, LLC*, 82 A.3d 731 (Del. Ch. 2013), *aff'd*, 105 A.3d 990 (Del. 2014) (hereinafter "*PCRS I*"). All references hereinafter to the record in the Prior Action are marked "Ch. D.I." corresponding to that docket.

[3] *Id.* at 749.

[4] Stipulated Order Staying Litigation, *New Castle Cty. v. Pike Creek Recreational Servs., LLC*, C.A. No. 5969-JW (Del. Ch. Dec. 9, 2016) (Ch. D.I. 213).

of the obligations created by the interaction between a restrictive covenant operating on the land (the "Covenant") and the Uniform Development Code (the "UDC") regulating land use and zoning throughout the County.[5] Their ongoing negotiations to resolve the Prior Action have in turn halted while they await a binding ruling resolving that dispute through this lawsuit.[6]

## I. PARTIES' POSITIONS

The parties each ask the Court to issue a declaratory judgment determining how a current UDC provision addressing prior restrictive covenants ("Section 1.150")[7] operates on the overlap of the Covenant's housing cap and the UDC's density limitations. PCRS believes that under Section 1.150, the Covenant's housing cap displaces the UDC's density limitations. The County believes development in the Pike Creek Valley must satisfy both simultaneously.

## II. PRIOR RULINGS ON THESE MOTIONS

The parties raised two other arguments in their cross-motions. PCRS claimed that it possessed a vested development right[8] in accordance with the standard the

---

[5] Stipulation for the Filing of a Declaratory Judgment Action, C.A. No. 5969-JW (Del. Ch. May 24, 2018) (Ch. D.I. 250).

[6] *Id.*

[7] NEW CASTLE CTY., DEL., CODE OF ORDINANCES ch. 40, § 40.01.150 (2020) (available at https://library.municode.com/de/new_castle_county/codes/code_of_ordinances?nodeId=CH40U NDECO) (last visited August 12, 2020).

[8] Plf. Op. Br. at 34 (D.I. 9).

Delaware Supreme Court promulgated in *In re 244.5 Acres of Land*.[9] The County countered that because PCRS had never raised the Section 1.150 issue in the Prior Action or elsewhere, laches barred enforcement of PCRS's interpretation of the UDC even if it is correct.[10] The Court separately considered these arguments, and rejected both in an earlier bench ruling.[11]

As the Court explained, a developer who takes actions reliant on then-existing zoning rules to advance a particular development can, if the circumstances warrant under a balancing test,[12] accrue a vested right to have the development evaluated under those rules notwithstanding an intervening change in law.[13] But PCRS is not seeking exemption from some change in law that arose since its development efforts began in 2010.[14] Rather, PCRS seeks to avoid application of UDC density restrictions enacted years before it took ownership or began development efforts.[15] The vested rights doctrine is inapplicable here.

---

[9]   808 A.2d 753 (Del. 2002).

[10]   Def. Ans. Br. at 32 (D.I. 14).

[11]   D.I. 33.

[12]   *See Town of Cheswold v. Cent. Delaware Bus. Park*, 188 A.3d 810, 821–22 (Del. 2018) (identifying a non-exhaustive list of factors to consider and weigh).

[13]   Tr. of Bench Ruling, March 2, 2020, at 9 (D.I. 33).

[14]   *Id.* at 8.

[15]   *Id.*

The County's reliance on laches is likewise misplaced. "The equitable doctrine of laches prevents a plaintiff from exercising unreasonable delay in bringing an action when that delay prejudices a defendant's rights."[16] But as this Court has frequently observed, the Superior Court is "a court of law—not equity"[17] and therefore "lacks jurisdiction to consider the laches and unclean hands defenses."[18] A judge of this Court can consider laches only in narrow contexts, such as when conducting appellate review of the decision of an administrative agency that can itself consider laches,[19] or when cross-designated with the Court of Chancery.[20]

"Delaware proudly guards the historic and important distinction between legal and equitable jurisdiction," and cross-designation to sit as both a court of law and

---

[16] *Nationwide Mut. Ins. Co. v. Starr*, 575 A.2d 1083, 1088 (Del. 1990).

[17] *Trustwave Holdings, Inc. v. Beazley Ins. Co., Inc.*, 2019 WL 4785866, at *6 (Del. Super. Ct. Sept. 30, 2019) (citing *Juras v. Bd. of Pension Trs.*, 1992 WL 357864, at *2 (Del. Super. Ct. Oct. 15, 1992); *Kerly v. Battaglia*, 1990 WL 199507, at *4 (Del. Super. Ct. Nov. 21, 1990)).

[18] *Sun Life Assur. Co. of Canada v. Wilmington Tr., Nat'l Assoc.*, 2018 WL 3805740, at *3 (Del. Super. Ct. Aug. 9, 2018) (citing *Mine Safety Appliances Co. v. AIU Ins. Co.*, 2016 WL 498848, at *12 (Del. Super. Ct. Jan. 22, 2016)).

[19] *See State v. Moffitt*, 2000 WL 973120, at *3 (Del. Super. Ct. May 3, 2000) (reversing a decision of the Adult Entertainment Commission because "there is not substantial evidence established in the record to validate a defense of laches which would warrant dismissing this case on the basis of prejudice resulting from the delay."); *McGlinchey v. Phoenix Steel Corp.*, 293 A.2d 585, 588 (Del. Super. Ct. 1972) ("[L]aches or estoppel may be a ground to deny the award of benefits retroactively" in appeals from the Industrial Accident Board subject to appellate review before the Superior Court "to determine whether there is substantial evidence to support the Board's findings.").

[20] Tr. of Bench Ruling, March 2, 2020, at 9 (D.I. 33).

-4-

equity is a "very rare departure" through which a judge of this Court occasionally derives "fleeting equitable powers."[21] But even then, there remains a firm divide.

When a judge of this Court is cross-designated, he or she exercises the powers of a judge at law on the legal (Superior Court) claims and the powers of a judge in equity on the equitable (Court of Chancery) claims. And while the County suggested otherwise, that "fleeting power" does not extend from the Prior Action—where this judge *is* cross-designated—to the present case, a separate and distinct suit at law for declaratory judgment. So the Court is without jurisdiction to consider laches here.

## III. APPLICABLE LEGAL STANDARDS

The parties have stipulated that this particular foray in their legal battle presents solely issues of law and that they could, therefore, engage immediately via cross-motions for summary judgment without discovery.[22] That means the parties have agreed they have no dispute as to any material fact here. With that agreement, the only remaining questions are those of statutory and contract interpretation.[23]

---

[21] *Weston Invs., Inc. v. Domtar Indus., Inc.*, 2002 WL 31011141, at *1 (Del. Super. Ct. Sept. 4, 2002).

[22] Plf. Op. Br. ex. K at ¶ 5 (D.I. 9).

[23] *See PCRS I* at 753 ("The legal force and origin of the restrictive covenants that bind the subject acreage here is contractual in nature and has been so construed.") (citing *Seabreak Homeowners Ass'n, Inc. v. Gresser*, 517 A.2d 263, 269 (Del. Ch. 1986)). Though the UDC is a municipal ordinance rather than an enactment by the Legislature, "[p]rinciples of statutory construction generally apply with equal force to municipal ordinances." *One–Pie Invs., LLC v. Jackson*, 43 A.3d 911, 914 (Del. 2012).

Both topics are solely questions of law for the Court to decide.[24]

"Where cross-motions for summary judgment are filed and neither party argues the existence of a genuine issue of material fact, 'the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions.'"[25] And a matter should be disposed of by summary judgment whenever only a question or questions of law remain and a trial is unnecessary.[26] The matter is therefore ripe for judgment as a matter of law.

The standards for interpreting statutes and contracts are similar. "Clear and unambiguous language in [a contract] should be given its ordinary and usual meaning."[27] Likewise, "[t]hat clear and unambiguous language in a statute is ordinarily the conclusive evidence of legislative intent is an elementary rule."[28]

---

[24] *See Dambro v. Meyer*, 974 A.2d 121, 129 (Del. 2009) ("Questions of statutory interpretation are questions of law. . ."); *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992) ("The proper construction of any contract . . . is purely a question of law.") (citing *Aetna Cas. and Sur. Co. v. Kenner*, 570 A.2d 1172, 1174 (Del. 1990)).

[25] *Motors Liquidation Co. DIP Lenders Tr. v. Allianz Ins. Co.*, 2017 WL 2495417, at *5 (Del. Super. Ct. June 8, 2017), *aff'd sub. nom, Motors Liquidation Co. DIP Lenders Tr. v. Allstate Ins. Co.*, 2018 WL 3360976 (Del. July 10, 2018).

[26] *Jeffries v. Kent Cty. Vocational Tech. Sch. Dist. Bd. of Educ.*, 743 A.2d 675, 677 (Del. Super. Ct. 1999); *Brooke v. Elihu-Evans*, 1996 WL 659491, at *2 (Del. Aug. 23, 1996) ("If the Court finds that no genuine issues of material fact exist, and the moving party has demonstrated his entitlement to judgment as a matter of law, then summary judgment is appropriate.").

[27] *Lazard Tech. Partners, LLC v. Qinetiq North Am. Ops. LLC*, 114 A.3d 193, 195 n.9 (Del. 2015) (quoting *Rhone–Poulenc*, 616 A.2d at 1195–96).

[28] *Magill v. North Am. Refractories Co.*, 128 A.2d 233, 236 (Del. 1956).

Delaware applies equivalent interpretive rules in the statutory and contractual contexts, refusing to enforce highly literal readings that lead to absurd results[29] and ending their inquiry to the exclusion of extrinsic evidence when unambiguous language makes the meaning of the contract or statute plain.[30]

## IV. FACTUAL BACKGROUND

Delaware courts have addressed various aspects of Pike Creek Valley's development on any number of occasions.[31] So the Court provides only an updated Reader's Digest version of that history here.

In 1964 four large landowners resolved to develop the Pike Creek Valley "pursuant to a comprehensive master plan, applying the principles of a planned unit development."[32] To further this goal, they then entered in to a deed restriction

---

[29] *See Coastal Barge Corp. v. Coastal Zone Indus. Control Bd.*, 492 A.2d 1242, 1246 (Del. 1985) ("Ambiguity may also arise from the fact that giving a literal interpretation to words of the statute would lead to such unreasonable or absurd consequences as to compel a conviction that they could not have been intended by the legislature."); *Capella Hldgs., LLC v. Anderson*, 2017 WL 5900077, at *5 (Del. Ch. Nov. 29, 2017) ("[T]he court will reject a party's proffered interpretation of contract language if that construction will yield 'an absurd result or is one that no reasonable person would have accepted when entering the contract.'") (citing *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010)).

[30] *See Freeman v. X-Ray Assocs., P.A.*, 3 A.3d 224, 230 (Del. 2010) ("[W]hen a statute is clear and unambiguous there is no need for statutory interpretation."); *Equitable Tr. Co. v. Gallagher*, 102 A.2d 538, 542 (Del. 1954) ("There can be no doubt of the force and value of the parol evidence rule in those cases to which it applies. It operates to . . . prevent a showing that an agreement was not to be enforced against one of the signatories; or otherwise to prevent a person from talking the substance out of what he has put into writing.") (internal citations omitted).

[31] *PCRS I* at 735–44 (setting forth, in detail, the factual and "tortured legal history" of the development of Pike Creek Valley.).

[32] *Id.* at 736.

("1964 Agreement") imposing restrictions on the subject acreage in concert with the County's zoning authority making certain changes to the applicable zoning laws to enable development in accordance with that master plan.[33] In 1969, those landowners—with the County's approval granted the following year—added amendments ("1969 Agreement"), which together comprise the Covenant.[34] The 1969 Agreement expanded the land covenanted to 1,363.58 acres.[35]

PCRS later acquired a portion of the land, and the Prior Action relates to permissible development activities on that land. For the parties' negotiations during the stay in the Prior Action, PCRS assembled a working group involving some local residents.[36] With the input of that working group, PCRS drafted and submitted a proposed development plan and deed restriction change to the County's Land Use and Planning Board ("Board").[37] The deed restriction change envisions replacing the golf course set-aside with a semi-private open space, while the development plan contemplates building slightly more than 220 housing units on the remaining land.[38]

---

[33] *Id.*

[34] *Id.* at 737.

[35] *Id.*

[36] Compl. at ¶¶ 10, 11 (D.I. 1); Ans. at ¶¶ 10, 11 (D.I. 3).

[37] *Id.*

[38] Compl. ex D. at 7 (D.I. 1).

The Board recommended denial, stating in relevant part that, less the set-aide, PCRS's property contains "approximately 47 developable acres, upon which approximately sixty (60) housing units could be built" consistent with the UDC.[39] The Board also recommended rejecting a deed restriction change, citing a number of problems with the semi-private open space plan not implicated in this suit.[40]

The original landowners created the Covenant to "develop the aforesaid acreage under and pursuant to a comprehensive master plan."[41] The County is the beneficiary through its predecessor, the Levy Court.[42] The Covenant lasts "until the last dwelling unit is constructed on the SUBJECT ACREAGE within the permissible limits."[43]

The 1964 Agreement includes the pledge that "not more than 4,500 family dwelling units will be constructed or erected on the SUBJECT ACREAGE,"[44] a total raised in the 1969 Agreement to 5,454.[45]

---

[39] Compl. at ¶ 10, 11 (D.I. 1); Ans. at ¶¶ 10, 11 (D.I. 3); *see generally* NEW CASTLE CTY., DEL., CODE OF ORDINANCES ch. 40, § 40.01.150 (2020).

[40] Compl. ex D. at 9–11 (D.I. 1).

[41] Compl. ex. A. at 1 (D.I. 1) (capitals in original).

[42] *Id.* at ¶ 3.

[43] *Id.* at ¶ 15.

[44] *Id.* at ¶ 9.

[45] Compl. ex. B. at ¶¶ 2, 6 (D.I. 1).

The Covenant ends by stating that "in the event that provision shall be made in the applicable zoning law for planned unit development districts or similar types of zoning law the SUBJECT ACREAGE may be appropriately zoned thereunder, provided that such rezoning would permit DEVELOPERS to accomplish all of the aspects of the preliminary, tentative comprehensive plan and of the updated master plan and would not be more restrictive than the limitations imposed upon DEVELOPER by the terms of this agreement."[46]

## V. DISCUSSION

This case is unusual in that the matter at issue is *not* whether the Covenant prohibits or permits a particular land use. The barrier to the contemplated development lies in the UDC, not the Covenant. Instead, PCRS seeks to supplant certain UDC regulations with less restrictive terms conceived from the Covenant by invoking its reading of the UDC's Section 1.150:

> No prior restrictive covenants that have been entered into in which New Castle County is a beneficiary shall be altered by the provisions of this Chapter. Where such covenants restrict the type of uses under former New Castle County zoning districts, those uses shall remain restricted regardless of the rezoning of the district.

---

[46] Compl. ex. A. at ¶ 16 (D.I. 1).

-10-

The County enacted the UDC in 1997.[47] And, no doubt, the Covenant is a "prior restrictive covenant" to which the County is a beneficiary. So, no doubt, Section 1.150 applies. But the parties' hotly dispute the legal effect of that application here.

**A. BOTH THE COVENANT AND UDC APPLY UNLESS APPLICATION OF THE UDC CHANGES THE OBLIGATIONS TO COVENANTED LANDOWNERS.**

The parties' dueling interpretations of Section 1.150 hinge on whether, when a prior covenant and the UDC both restrict the same type of activity, the covenant applies *in lieu of* or *in addition to* the UDC. By its terms, Section 1.150 specifies only that the UDC's other provisions shall not "alter" preexisting covenants.

A provision of the UDC would alter the Covenant if application of the UDC would change the meaning of the instrument.[48] Such an alteration is material if it would change the burdens, liabilities, or duties of a party or changes the operation of any of its terms.[49] Thus, Section 1.150 is implicated if the UDC purports to ban what the Covenant grants, or forbid what the Covenant requires.

---

[47] *Sterling Prop. Hldgs., Inc. v. New Castle Cty.*, 2004 WL 1087366, at *3 (Del. Ch. May 6, 2004).

[48] *See Alteration*, BLACK'S LAW DICTIONARY 97 (11th ed. 2019) ("An act done to an instrument, after its execution, whereby its meaning or language is changed").

[49] *Id.*

-11-

## B. The Covenant is Solely a Burden Appurtenant to Land of The Pike Creek Valley.

"A restrictive covenant is a servitude."[50] "While the law favors the free use of land and frowns on restrictive covenants, they are recognized and enforced where the parties' intent is clear and the restrictions are reasonable."[51] The Covenant created just such a servitude running with the land,[52] that is to say a burden appurtenant.[53]

Delaware Courts interpret deed restrictions under principles of contract.[54] Thus, "[t]he Court will interpret clear and unambiguous terms according to their ordinary meaning."[55] The Covenant pledges that "not more than" 5,454 family dwelling units will be constructed in the Pike Creek Valley. This language admits

---

[50] *Reserves Mgmt. Corp. v. R. T. Props., LLC*, 80 A.3d 952, 957 (Del. 2013) (quoting Restatement (Third) of Property: Servitudes § 1.1(2) (2000)).

[51] *Chambers v. Centerville Tract No. 2 Maint. Corp.*, 1984 WL 19485, at *2 (Del. Ch. May 31, 1984) (quoting *Maher v. Park Homes, Inc.*, 142 N.W.2d 430 (Iowa 1966)).

[52] *PCRS I* at 745.

[53] *C.f. Tubbs v. E. & E. Flood Farms, L.P.*, 13 A.3d 759, 768 (Del. Ch. 2011) (an easement appurtenant runs with the land, while an easement in gross is the personal property of the easement holder); *see also Covenant*, BLACK'S LAW DICTIONARY 457-60 (11th ed. 2019) (detailing types of covenants, including covenants appurtenant and in gross).

[54] *Penn Mart Supermarkets, Inc. v. New Castle Shipping LLC*, 2005 WL 3502054, at *5 n.34 (Del. Ch. Dec. 15, 2005).

[55] *GMG Capital Inv., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012) (citing *Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 145 (Del. 2009)).

of only one meaning—a limitation, not a grant.

Though the final clause uses permissive language to describe when a zoning authority "may" rezone areas of the Pike Creek Valley as a planned unit development district, the landowners lacked the authority to bind the zoning authority. As PCRS itself acknowledged in the Prior Action, the Covenant could not possibly give the landowners any rights enforceable against the Levy Court or its successors, since Delaware forbids contract zoning.[56] At most, the final clause illustrates the assumptions the landowners made regarding future zoning conditions in the Pike Creek Valley.

## C. THE COVENANT IS IN ADDITION TO, NOT PREEMPTIVE OF, THE UDC DENSITY RULES.

Because the Covenant is solely restrictive, the UDC does not work an alteration on it unless it imposes a requirement mutually irreconcilable with one already contained in the Covenant. If the UDC forbade golf courses, for example, that restriction would be in conflict with an affirmative obligation in the Covenant and create an alteration. Under that circumstance, the Court would need to resolve the conflict under, among other considerations, Section 1.150. But not here.

---

[56] *See PCRS I* at 736 n.17 ("PCRS has argued that the 1964 Agreement constitutes an illegal zoning by contract. . . . Contract zoning is usually distinguished from conditional zoning by a finding that in contract zoning, there is a bilateral agreement committing the zoning authority to a legally binding promise while in conditional zoning the zoning authority does not legally bind itself to rezone.") (internal citations omitted).

The Covenant creates one set of restrictions on use in the Pike Creek Valley by capping the total number of households permissible in the total subject acreage. The UDC introduces an additional restriction, limiting the density of households independent of that cap. Because both restrictions are solely limitations on household construction, adhering to one cannot possibly interfere with obedience to the other. Since there is no conflict of obligations, the UDC does not work an alteration. Both sets of restrictions and limitations apply.

## VI. CONCLUSION

The Covenant is a restriction on land use in the Pike Creek Valley. The original landowners created that restriction in the 1960s as an inducement for the zoning authorities to relax other zoning and land use restrictions so as to permit the development of the land in accordance with the Master Plan. Parcel by parcel, landowners have developed the area in accordance with the Master Plan over the intervening half-century such that the subject acreage now contains 5,000 family residential units out of the maximum 5,454 permitted under the Covenant.

PCRS is the owner of the last major undeveloped section of land subject to the Covenant, representing approximately fifteen percent of its total subject acreage. Under the Covenant, PCRS may develop some portion of that land—and other Pike Creek Valley landowners may redevelop their own parcels—to add residential units so long as the total number of residences remains below 5,454. Nevertheless, any

development or redevelopment in the Pike Creek Valley must still be consistent with the UDC, a law of general applicability independent of the Covenant.

For those reasons, PCRS's Motion for Summary Judgment is **DENIED** and the County's Cross-Motion for Summary Judgment is **GRANTED**. PCRS's development of its land must be consistent with both the UDC and the Covenant.

**IT IS SO ORDERED.**

Paul R. Wallace, Judge

Original to Prothonotary

cc: All Counsel via File and Serve