Joyce A. TUBBS and Stacey Tubbs, Plaintiff,

v.

E & E FLOOD FARMS, L.P., Defendant.

C.A. No. 5030–WW.

Court of Chancery of Delaware.

Submitted: Oct. 18, 2010.

Decided: Jan. 31, 2011.

Revised: Feb. 1, 2011.

---

**27.** *See Cantor Fitzgerald,* 2001 WL 536911 at *2–4.

Michael R. Smith, Griffin & Hackett, P.A., Georgetown, Delaware; Attorney for Plaintiffs.

William B. Wilgus, Law Offices of William B. Wilgus, Millsboro, Delaware; Attorneys for Defendant.

## OPINION

WITHAM, Vice Chancellor.

This case presents three issues: (A) whether Petitioners have implied easements to use a disputed dirt road; (B) whether Petitioners have met the requirements to establish prescriptive easements over the disputed dirt road; and (C) if Petitioners have obtained easements, whether such easements are appurtenant or *in gross*.

## FACTUAL BACKGROUND

These are the facts as found after a two-day trial.

This case involves a dispute between neighbors over the use of a dirt road. The parties own neighboring properties that represent fragments of a larger farm formerly owned by Chandler and McCabe, Inc. (C & M). The C & M farm was bounded on the North by Route 26 and on the South by Route 405.[1] A 13 to 15 foot wide dirt road (farm lane) runs north-and-south through the middle of the property, connecting the two routes. The evidence demonstrated that C & M used the dirt road to enter and service the farm from both routes.[2]

In 1969, C & M sold 14 acres from the southern end of the farm to Joyce and Donald Tubbs. Joyce, Donald and their six-year old son, Stacey, moved into an old farmhouse on the property.[3] The property is located at what was once the southern end of the C & M farm, abutting Route 405. The deed of sale expressly granted Donald and Joyce Tubbs an easement to use the dirt road to access Route 405. The deed was silent as to Petitioners' right to use the dirt road to access Route 26.

According to the testimony at trial, the Tubbs regularly used the path to access Route 26 when leaving home for ordinary activities such as going to school, church, and shopping. C & M and its successors in interest apparently never objected. Over the ensuing decades, Donald and, later, Stacey Tubbs maintained the dirt road by laying down material to fill in pot holes.[4] Stacey Tubbs testified that the men also maintained the roadside ditch by cutting grass and "bush-hogging" it when necessary.[5] The Tubbs undertook such activities without direction and at their own expense.

Joyce and Donald Tubbs sold several portions from their property over the years. In 1975, they sold two acres to George Long. Long's land lies along the dirt road between the parties' properties. In 1997, Joyce Tubbs sold one acre to Stacey Tubbs, who had been living at his mother's home until that time. Stacey Tubbs and his then-wife moved into a trail-

---

1. Route 26 is also known as "the nine-foot road." Route 405 is known as "Gum Tree Road."

2. The testimony of Joyce Tubbs and the deposition of Chancellor Chandler demonstrate that C & M used both routes to access the farm.

3. Donald Tubbs died before the present controversy. Joyce and Stacey Tubbs are collectively referred to as "Petitioners."

4. (Trial Tr. At 48, 54, 108, 111.)

5. A colloquialism verifying Bush Hog, a maker of equipment for removing heavy vegetation.

er on his new property, which lies along the dirt road between his mother and Long.

George and Emma Flood bought the remainder of the old C & M farm (including the dirt road) from Curtis Steen in 1983. The chain of title can be traced back to C & M through several intermediate owners.[6] The Floods farmed the property but never resided there. They subsequently transferred the property to their family partnership, E & E Flood Farms, L.P. ("Respondent").[7]

George Flood ("Flood") testified that he had suspected that the Tubbs were trespassing on his road for many years.[8] He said he had never confronted them about their unwelcome use because he was waiting for an opportunity to catch them in the act.[9] In the interim, the State of Delaware placed a sign at the end of the dirt road, naming it "Tubbs Lane." [10]

Petitioners were not the only persons to make use of the road without permission. There was evidence that unknown members of the public sometimes used the dirt road to cut between Routes 26 and 405. For example, Stacey Tubbs remembered an incident when a long line of cars cut across the dirt road after a local high school graduation. Another example was provided by George Long, who testified that there were several incidents where teenagers had ridden across the dirt road in all-terrain vehicles at night.[11] Such incidents, which annoyed everyone living along the dirt road, were apparently isolated and sporadic.

Flood responded to these intrusions in several ways. Soon after purchasing the property, he installed "keep out" signs at either end of the road.[12] The signs failed to deter trespassers.

Flood took a more active approach in 1985 when he convinced George Long to build a gate across the dirt road.[13] In exchange for building and maintaining the gate, Flood agreed to permit Long to use the road for the remainder of his (Flood's) life. Long agreed and built the gate, which was kept closed but not locked.

It appears that Flood and Long had some misunderstanding regarding the purpose of the gate. Flood believed that he had engaged Long as his agent to exclude everyone (including Petitioners) from using the road.[14] Long understood the agreement differently. He believed the gate had been built solely to prevent unknown trespassers from cutting across the road.[15] He testified that he had no idea that Flood intended to exclude neighbors

**6.** As noted, Flood purchased the property from Curtis W. Steen in 1983. Steen had purchased the property from I.W. Long & Sons, Inc. in 1977. I.W. Long & Sons had purchased the property from C & M in 1973.

**7.** E & E Farms, L.P. is the named Respondent in this action. George and Emma Flood created the partnership to hold title to their property for the benefit of their children. George Flood testified that he will control the limited partnership until his death.

**8.** (Trial Tr. at 198.)

**9.** (Trial Tr. at 211.)

**10.** George Long, a neighbor between the feuding parties, testified that he believed Flood became more assertive about excluding the Tubbs after this sign was posted. (Trial Tr. at 187.)

**11.** (Trial Tr. at 180.)

**12.** (Trial Tr. at 198–99.)

**13.** Long testified that he installed the gate sometime after 1996, but less than ten years before trial. (Trial Tr. at 172.)

**14.** (Trial Tr. at 205.)

**15.** (Trial Tr. at 180.)

such as the Tubbs. Thus, Long knew that Petitioners often used the road, but he never attempted to interfere.

Flood made one last effort to close the road in 2005. He suspended a cable across the road in order to render it impassable. This direct action finally caused Petitioners to stop using the contested portion of the dirt road.[16]

## PROCEDURAL HISTORY

Trial was held before me at Chancery Court in Georgetown, Delaware on October 18, 2010. I sit in the Court by designation as a vice chancellor pursuant to Del. Const. Art. IV, § 13(2). I reserved decision in this case. The opinion of the Court now follows.

## DISCUSSION

Petitioners are seeking recognition of an easement to use the dirt road to access Route 26. They claim both implied and prescriptive easements.

### A. Easement by Implication

■ The first claim is for an easement by implication. The creation of an interest in land normally must be evidenced by a writing.[17] However, courts recognize implied easements when the facts indicate that the parties to a real estate transaction intended to convey an easement but failed to do so expressly. The *prima facie* case for an implied easement requires clear and convincing evidence of each of the following elements:

(1) the relevant properties were owned by a prior common owner who customarily used one property to benefit the other, (2) the resulting "quasi-easement" was reasonably necessary to the enjoyment of the quasi-dominant tenement, and (3) the quasi-easement was apparent at the time that the properties were separated.[18]

1. Common Owner's Quasi easement.

■ There are several helpful sources of evidence on this issue. First, Chancellor Chandler provided deposition testimony about his childhood trips to the C & M property between 1961 to 1967. Chancellor Chandler's father had an ownership interest in the old C & M farm. He toured the farm every month to conduct business with the tenant farmers. The Chancellor remembered that they would enter the farm by using the dirt road from either Route 26 or Route 405, whichever was more convenient. He played with the tenant farmers' children and rode horses up and down the length of the dirt road. If nothing else, this shows that the road existed and was used to access the C & M farm during the 1960s in either direction.

Second, Joyce Tubbs testified about the C & M farm as it was when she visited her brother (who was a tenant farmer on the property) during the 1960s. Her brother lived on the portion of the C & M farm that she and her husband purchased in 1969.[19] Joyce Tubbs testified that she visited her brother on a weekly basis and generally reached his home by taking the dirt road to and from Route 26.[20]

---

16. The cable was removed by an unknown wrongdoer several months later. (Trial Tr. at 211.) However, the petitioners have not resumed using the disputed portion of the dirt road.

17. *Potter v. Gustafson,* 192 A.2d 453, 455 (Del. Ch.1963)

18. *Id.* at 455–56 (Del. Ch.1963) (*citing* 17A American Jurisprudence, Easements § 42–p. 654 et seq.).

19. (Trial Tr. at 42–43.)

20. *Id.*

The uncontradicted testimony of Joyce Tubbs and the deposition of Chancellor Chandler indicate that the road existed at the time of the partition, and that it was used to conveniently reach points within the C & M farm, including the land later purchased by Joyce and Donald Tubbs. Therefore, the Court finds that the dirt road (including its Route 26 access) was used as a quasi-servient tenement that benefitted the remainder of the property. The first element is met.

## 2. Reasonable Necessity.

 The second element is more difficult. Courts will not construct an implied easement unless there is clear and convincing evidence that it would have appeared reasonably necessary for the enjoyment of the quasi-dominant tenement at the time when the properties were separated.[21]

The Petitioners concede that their properties can generally be reached from the Route 405 end of the dirt road. Their main objection is that they simply prefer to use Route 26 and feel they have a right to do so. More compellingly, Petitioners explain that Route 26 sometimes becomes their only link to the world after rainstorms flood the Route 405 end of the dirt road. This occurs because the northern (Route 26) end of the contested dirt road is more elevated than the southern end. Consequently, the Route 26 end remains open after rainstorms have flooded the access to Route 405.[22]

The seriousness of the flooding is disputed. Petitioners testified that the path to Route 405 is sometimes (albeit rarely) completely washed-out.[23] Conversely, Vernon Hudson, a neighbor of Stacey Tubbs, testified that there is occasional flooding but that it is never severe enough to render the road impassible.[24] Regardless, the testimony seems to be in agreement that flooding occurs only very rarely. That suggests that access to Route 26 may not have appeared "reasonably necessary" for the enjoyment of the property at the time of the sale. The evidence is unclear at best, which means Petitioners have failed to meet their burden of proving reasonable necessity by clear and convincing evidence.

## 3. Quasi Easement Manifest at the Time of Sale.[25]

The evidence indicates that the quasi easement should have been apparent in 1969 when the Tubbs purchased their plot. As previously noted, the Chancellor and Joyce Tubbs gave testimony showing that the road was in use in the years leading up to 1969. Joyce Tubbs gave further testimony that the road was used in this manner up until the sale. Her assertion is credible because it is consistent with her earlier testimony and with the testimony of the Chancellor. Under these facts, the Court finds that C & M's quasi-easement was apparent at the time when the properties were severed.

In summary, Petitioners have only established two of the three requirements for an implied easement. The Court holds that Petitioners do not possess implied easements to use the disputed dirt road.

---

21. *See Potter v. Gustafson*, 192 A.2d 453, 456 (Del.Ch.1963) (explaining that implied easements are created by the presumed intent of the parties to a conveyance).

22. (Trial Tr. at 84–85.)

23. (Trial Tr. at 113–14.)

24. (Trial Tr. at 166.)

25. This requirement will be briefly discussed even though the failure of the second element is fatal to Petitioners' implied easement claim.

## B. Easement by Prescription

■ The second claim is for an easement by prescription. In order to prevail, Petitioners must show, by clear and convincing evidence,[26] that they have used the dirt road in a manner that is: (1) open and notorious, (2) exclusive (against the public at large), (3) continuous for an uninterrupted period of at least 20 years, and (4) hostile to the true owner's claim of right.[27] These elements will be addressed in order.

### 1. Open and Notorious Use.

■ The first element is satisfied because the Tubbs have used the dirt road in an overt manner that should have been sufficient to make Respondent and its predecessors in interest aware of the imposition. The purpose of the "open and notorious" element is to ensure that the true owner has fair notice of the adverse use.

In this case, both Petitioners testified that they regularly used the dirt road for decades. Joyce Tubbs testified that she has used it to reach Route 26 when leaving her home for ordinary activities like shopping or going to church.[28] Stacey Tubbs testified that he traveled down the road every day as a child in order to reach his school-bus stop along Route 26.[29] Such activities were not clandestine; they were apparent. In fact, Flood admitted at trial that he had long believed that the Tubbs were using the road and he was waiting to

"catch them in the act."[30] He was on notice, and this element is satisfied.

### 2. Exclusive Use.

■ A prescriptive easement claimant must demonstrate that he has used the property in a manner that is exclusive relative to the public at large.[31] This ensures that successful claimants have an extraordinary claim to use the property. The element can be met even though the true owner continues to use the property during the period of adverse use.[32]

In this case, the Tubbs used the road as if it were their own. There is abundant evidence that the Tubbs used the road on a regular basis for nearly four decades (1969–2005).[33] They maintained it at their own expense by filling in potholes and removing vegetation from the roadside ditch. These facts demonstrate that the Tubbs used the road in an altogether more intense open manner than did those members of the general public who occasionally used it as a shortcut between Routes 26 and 405. The Court finds that difference to be compelling. There is clear and convincing evidence of exclusive use.

### 3. Continuous Use for an Uninterrupted Period of 20 years.

■ A party claiming an easement by prescription must show that he used the easement for a continuous period of 20 years. Continuous use need not be literal-

26. *See Dewey Beach Lions Club, Inc. v. Longanecker,* 2006 WL 701980 at *3 (Del.Ch.2006) (explaining that prescriptive easements are disfavored because they work a forfeiture).

27. *Brown v. Houston Ventures, L.L.C.,* 2003 WL 136181 at *5.

28. (Trial Tr. at 52–55.)

29. Stacey continued to ride the bus after getting his first car as a teenager; he would drive to the end of the dirt road and leave his

car parked there while he was at school. (Trial Tr. at 115.)

30. (Trial Tr. at 204, 211.)

31. *Brown v. Houston Ventures, L.L.C.,* 2003 WL 136181 at *5.

32. *Id.*

33. The relevant testimony will be addressed in detail in the following section.

ly constant. Rather, a party is considered to use property in a continuous manner if he uses it as if he were the true owner (interest holder) of the easement.

██ There is abundant evidence that Petitioners began using the disputed portion of the road in 1969 and continued to do so for at least 20 years. As previously discussed, both Petitioners testified to their regular use of the road for every-day tasks. Their testimony was corroborated by several witnesses. Aaron Bunting was a childhood friend of Stacey Tubbs. He frequently visited Petitioners from 1971 (when he moved to the area) until at least 1980. He testified that Petitioners regularly used the dirt road to access Route 26 when leaving and returning home during that time.[34]

George Long provided additional support for Petitioners' claim. He testified that Petitioners often used the road from at least 1975 (when he moved into the neighborhood) until about 2005. Long's testimony is particularly helpful because he lives immediately between the parties on the dirt road where he should have ample opportunity to observe. Moreover, Long is the unofficial gatekeeper of the dirt road, so it is his business to know who uses it.

Respondent called Vernon Hudson and Brian Tingle to testify that Petitioners rarely used the road. Unfortunately, neither witness had an adequate opportunity to observe the road during the period of adverse use. Tingle helped Flood collect harvests at the E & E Farm from the mid 1980s to the early 1990s. His testimony is not particularly helpful because he only remained at the property for a few days out of any given year.[35] Hudson's testimony suffers from the same defect. He has lived across the dirt road from Stacey Tubbs for 15 years. However, he testified that he was rarely at home during daylight hours until 2003. That schedule did not leave Hudson with much opportunity to observe whether Petitioners used the road.[36]

After weighing the relevant evidence, the Court finds that there is clear and convincing evidence that the Tubbs used the farm lane for a continuous, uninterrupted period of 20 years. The continuous use element is satisfied.

4. Hostile Use.

██ A prescriptive easement claimant must show that his use of the property was hostile. Hostility is a term of art meaning that the use is adverse to the true owner's claim of right.

██ Respondent admitted at trial that Petitioners had used the road without permission and in violation of his rights.[37] Yet, he sat on his rights and did not attempt to resolve the controversy until after the 20 year period of adverse use was complete. The hostility element would be clearly satisfied even without the admission. Petitioners used the road without permission for several decades. They even changed its physical composition by purchasing and laying down fill material— again without permission. Such activities clearly violated Respondent's right of ex-

---

**34.** (Trial Tr. at 131.)

**35.** (Trial Tr. at 149.)

**36.** Worse, it appears that Hudson did not even move into the neighborhood until after the 20 year period was complete. Hudson testified that he has lived in his present home for "more than 15 years." He would have arrived after the period of adverse use (1969–1989) even if he had moved into his home 20 years ago. (Trial Tr. at 154).

**37.** (Trial Tr. at 213.)

clusive possession of real property. Respondent (or its predecessors in interest) might have put an end to the hostile use by bringing an action for trespass before the conclusion of the period of adverse use. It failed to do so, and now it is too late. The final element is satisfied. Petitioners have obtained an easement by prescription.

## C. Whether the Easements Will Run With the Land.

Finally, it must be determined which type of easements Petitioners have obtained. There are two broad categories of easements. An easement appurtenant includes a dominant tenement that is benefitted and a servient tenement that is burdened.[38] Easements appurtenant "run with the land," which means they pass with the dominant tenement to successors in interest.[39] Conversely, an easement *in gross* involves only the servient tenement, which is burdened by the personal property interest of an easement holder.[40] There is a public policy favoring the construction of easements as appurtenant rather than *in gross* when they could reasonably be construed in either category.[41]

In this case, the easements provide both Petitioners with access to their properties. Such access must benefit them as landowners. Thus, the easements are appurtenant. This conclusion is obvious as far as it concerns Joyce Tubbs who used the road to reach her property for more than three decades after obtaining it in 1969.

Stacey Tubbs seems to present a more complicated claim because he only became a landowner in 1997.[42] Based on the evidence already discussed, the Court finds that Petitioners made adverse use of the road from 1969 until 2005. A prescriptive easement only requires a 20 year period of adverse use. Thus, the Tubbs could have petitioned the Court to recognize their easements as early as 1989. They did not do so. A prescriptive easement vests at such time as a court of equity recognizes it. It follows that the Court, in defining the easement, is not limited from considering the continuing period of adverse use after 1989. It is clear that Stacey Tubbs used the road to benefit himself as a landowner from 1997 until 2005. Therefore, his easement—as recognized today—is appurtenant.[43]

## CONCLUSION

The Court holds that both Petitioners have obtained easements by prescription to use the dirt road to reach Route 26.[44] The easements are limited in scope to the nature and extent of the uses made during the period of adverse use (1969–2005).[45]

**38.** *O'Shaughnessy v. Bice*, 2003 WL 22787612 at *2 (Del.Super.2003).

**39.** *Id.*

**40.** *Id.*

**41.** Herbert Tiffany, *Real Property* § 394 (Callaghan & Co.1970) (1903).

**42.** A child has the same right as an adult to obtain property rights through adverse use. *See Deatherage v. Lewis*, 131 Ill.App.3d 685, 86 Ill.Dec. 797, 475 N.E.2d 1364, 1367 (1985) (holding that an infant is not precluded from obtaining title through adverse possession). Even though an adult in 1997, he is in privity of ownership with his mother, Joyce Tubbs.

**43.** This is consistent with the longstanding public policy favoring the construction of easements as appurtenant. Herbert Tiffany, *Real Property* § 394 (Callaghan & Co.1970) (1903).

**44.** Respondent continues to own the dirt road. It has not been subject to adverse possession.

**45.** *See Wieczorek v. Simmons*, 1987 WL 7529, 1987 Del. Ch. Lexis 387; *See also Potter v. Gustafson*, 192 A.2d 453, 456 (Del.Ch.1963).

Thus, Petitioners may use the easement for ingress and egress from their properties, and they may also repair the road (at their own expense) as necessary.

The Petitioners may submit a form of order incorporating this decision to the Court.