# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

REYBOLD VENTURE GROUP IX, )
LLC, a Delaware limited liability )
company, )
     )
         Plaintiff, )
     )
         v. )   C.A. No. 2020-0982-SEM
     )
SUMMIT PLAZA SHOPPING )
CENTER, LLC, a Delaware limited )
liability company, )
     )
         Defendant. )

Final Report: July 31, 2024
Date Submitted: March 22, 2023

## FINAL POST-TRIAL REPORT

John H. Newcomer, Jr., MORRIS JAMES LLP, Wilmington, DE; *Counsel for Plaintiff.*

Phillip A. Giordano, GORDON, FOURNARIS & MAMMARELLA, P.A., Wilmington, DE; *Counsel for Defendant.*

**MOLINA, M.**

Through this action, neighboring property owners dispute the enforceability of a purported easement for pedestrian and vehicular access. The disputed easement is in a note on a subdivision and development plan recorded in 1984. For the reasons explained herein, I find the note reserved an express easement which guarantees the plaintiff pedestrian and vehicular access through the defendant's property (and vice versa). The plaintiff is thus entitled to declaratory relief. The plaintiff has not, however, demonstrated that injunctive relief is warranted at this time. This is my final post-trial report.

## I.      BACKGROUND[1]

The players in this action, the plaintiff, Reybold Venture Group IX, LLC ("Reybold") and the defendant, Summit Plaza Shopping Center, LLC ("Summit"), own adjoining parcels of real property in New Castle County. Reybold seeks to enforce its purported right of access through Summit's property. I begin when the properties were jointly owned, walk through the rezoning process, and briefly address the relevant factual predicate leading to this action.

---

[1] The facts in this report reflect my findings based on the record developed at trial on November 8, 2023. *See* Docket Item ("D.I.") 65, 66. I grant the evidence the weight and credibility I find it deserves. Citations to the trial transcript are in the form "Tr. #." The parties' jointly submitted exhibits are cited as "JX __."

1

## A.     Viola Carter's Legacy

The properties at issue were once within a large parcel owned by Viola Carter.[2]  In the 1980s, Ms. Carter owned over 196 acres of land along Route 301, in what is now Middletown.[3]  Sometime in or around 1983, Ms. Carter decided to sell a 2.97-acre portion of her property (the darkened hexagonal shape reflected in the image below) to a developer.[4]



Within that relatively small area, the developer planned to build a shopping center.[6]

---

[2] JX55 at 12.

[3] *See* JX13.

[4] JX22 (reflecting the prospective purchaser as the equitable owner).

[5] *Id.*

[6] *See* JX13.

To accomplish this goal, Ms. Carter's property would need to be rezoned and a development plan submitted for approval by New Castle County (the "County").[7] Thus, before the sale closed, the developer and Ms. Carter worked cooperatively on the development plan.[8] Civil engineering firm, Franco R. Bellafante, Inc. (the "Engineer") took the lead in representing Ms. Carter (as the record owner) and the developer (as the equitable owner).

The Engineer navigated the County's development process, which, at that time, required three steps.[9] First, the Engineer needed to prepare an exploratory plan

---

[7] This was before the property was annexed to Middletown.

My factual recitation focuses primarily on the development approval process, rather than the initial rezoning step. Delaware attorney Harilaos Tarabicos testified as an expert witness regarding the "holding zoning" for the property, the need to convert it to commercial, and the process for that in 1983. Tr. 102:11–18, 103:11–104:1, 105:23–106:10. Mr. Tarabicos' qualifications to so opine are uncontested and I find his testimony credible and persuasive to my understanding of this initial step.

[8] The parties dispute who was the impetus behind the rezoning and development plan—Ms. Carter, the developer, or the Engineer (as defined herein). Reybold's story is that Ms. Carter hired the Engineer and steered the process; Summit disagrees, highlighting the absence of Ms. Carter's name on the form submitting the exploratory plan and various communications. But I find it most likely that the effort was a joint one, through which Ms. Carter, the developer, and the Engineer worked cooperatively.

[9] Delaware attorney Richard Forsten testified as an expert witness for Reybold and provided credible and persuasive testimony regarding the approval process around this time. *See, e.g.*, Tr. 9:9–10:11. Mr. Forsten's expertise in this area is undisputed. I rely on his testimony as I walk through the process for the plan at issue. Mr. Forsten's testimony was echoed by Summit's expert witness Carmine Casper, who is also well qualified to opine on the development process in the 1980s and whose testimony I have considered and relied on in understanding the events that unfolded. *See* Tr. 184:14–187:16.

using the subdivision land development form.[10] In its July 19, 1983 submission, the Engineer completed the required form and provided a rough sketch of the proposed subdivision and development of a shopping center, with a drive thru, parking lot, landscape screen, and reserved room for a septic system.[11] On the form, the Engineer listed the developer as "E/O" or equitable owner; Ms. Carter's name is absent, but she was listed as the "owner" on the exploratory plan.[12]

The County then reviewed the exploratory plan, as was customary at that time, to determine whether the proposal was permissible, such that a preliminary plan could then be submitted.[13] On July 25, 1983, through a memorandum addressed to the Engineer, and cc'ing the developer, the County's Department of Planning (the "Department") indicated that the exploratory plan was "generally satisfactory," but that certain items needed to be addressed in the preliminary plan.[14]

After getting that green light, the Engineer moved to step two and submitted the preliminary plan that same day (on July 25, 1983).[15] In 1983, these types of

---

[10] Tr. 9:11–14. Per Mr. Forsten, as of 2006, exploratory plans are no longer required. Tr. 107:11–12, 124:3–6.

[11] JX2, 50. Before beginning this process, Ms. Carter filed a declaration binding her property. D.I. 1.

[12] JX2, 50.

[13] Tr. 9:17–20.

[14] JX3.

[15] JX4.

preliminary plans were directed to the Subdivision Advisory Committee (the "SAC"), which consisted of the state fire marshal and persons from various entities including the Delaware Division of Highways (now the Delaware Department of Transportation ("DelDOT"))[16] and the Delaware Departments of Natural Resources and Environmental Control and Education.[17] The SAC would meet to review plan submissions and their comments would be sent to the applicants for incorporation into the final record plan.[18] In addition to addressing the SAC's comments, an applicant in 1983 would also need to secure a letter of no objection from DelDOT, Public Works, and the Fire Department before they could move forward to a final plan.[19]

Through a letter dated July 29, 1983, the Department confirmed receipt of the preliminary plan and scheduled a meeting of the SAC for August 8, 1983.[20] The Department again cc'd the developer and directed: "The developer or his designated representative must be present . . . and be prepared to discuss fully the technical details of the proposed plan."[21]

---

[16] Tr. 13:12–13 ("It says Division of Highways. That's DelDOT.").

[17] Tr. 10:2–3, 119:23–10, 185:6–10.

[18] Tr. 10:3–7, 107:1–3, 193:7–18.

[19] Tr. 10:8–12, 194:8–21.

[20] JX4.

[21] *Id. See also* JX5 (meeting notice).

At the SAC's meeting, DelDOT shared its comments on the preliminary plan, providing, in pertinent part:

> The proposed access location is found to be acceptable, however, planning considerations regarding future access should be given at this time for development of other lands of Viola Carter. This could be a critical issue since we would not want additional access points affecting the operation of the N. Broad Street and U.S. Rt. 301 intersection. [22]

Thereafter, by memorandum dated August 18, 1983, the Department directed the Engineer, among other things, to add the following note to the plan (the "Note"):

> A cross-easement is hereby established between subject parcel and other lands of Viola Carter for vehicular and pedestrian traffic. Also a combined entrance-exit facility may be required in the future when and if the lands labeled 'other lands of Viola Carter' are developed for use or uses other than residential[]. [23]

---

[22] JX7. Comments from the State Fire Marshall and Public Works are available at JX8–9.

Around the time of the SAC meeting, Bob Burns from the Department contacted Ray Richter with DelDOT about an easement. JX11. *See also* Tr. 119:24–120:21, 191:11–13. The Department represented that it "would be amenable to pursuing a cross-easement agreement between [now the Summit property] and the [other lands] with respect to combined entrance-exit facilities in the future when and if the adjacent residential parcel is developed with a use or uses other than residential." JX11. Mr. Richter "agreed and said that his comments would be forthcoming . . . ." *Id.* This drafting implies that this conversation was before the SAC's meeting, but the memorandum in which it was summarized includes a discussion about another property, expressly after the meeting. *Id.* Thus, the exact timing is unclear.

[23] JX12. Mr. Forsten testified that "there are lots of plans that will contain notes that talk about easements." Tr. 14:9–10. *See, e.g.*, JX25, 27, 31. Mr. Tarabicos testified similarly explaining the County and DelDOT have "a strong interest to have interconnection so that you can get from one property, perform multiple errands internally, connect residential subdivisions to commercial subdivisions." Tr. 108:9–12. Per Mr. Tarabicos, "[t]hey always request cross easement agreement. So this note is very, very common." Tr. 108:19–21. *See also* Tr. 199:2–7 (Casper, same). Mr. Tarabicos did, however, testify regarding what he termed "inconsistency in how the County interprets" covenants or notations on plans. *See* Tr. 113:15–114:3 (reviewing JX40).

The parties agree that "[t]he Note was a requirement of the Delaware Department of Transportation to obtain its approval of the [p]lan."[24] The Engineer complied, the Note was added, and "Check Prints" of the final plan, a precursor to step three, were submitted on or about September 20, 1983.[25] Shortly thereafter, in October 1983, the County's Council (the "Council") received letters of no objection from DelDOT, Public Works, and the Fire Department.[26] With all concerns resolved, on November 3, 1983, the Department approved the final plan, and on November 8, 1983, so did the Council.[27] Thus, on November 9, 1983, the final plan was recorded, encumbering what is now Summit's property.[28]

The final plan contains the Note, word-for-word as proposed.[29] Ms. Carter signed the final plan as the property owner.[30] In so executing, she certified that she was the owner of the property, the subdivision plan was made at her direction, and she acknowledged that the proposed subdivision was her act and plan and that the

---

[24] D.I. 55 at 14.

[25] *See* JX14.

[26] JX17–19.

[27] JX20–21.

[28] JX22.

[29] *Id.*

[30] *Id.*

7

final plan could be recorded.[31] The developer is also listed on the final plan as the equitable owner of the subdivided parcel.[32]

## B. Subsequent Owners

Ms. Carter's sale to the developer closed thereafter, on September 20, 1984.[33] The developer went forward with the final plan and built Summit Plaza, currently owned by Summit.[34]

Reybold now owns neighboring land, south of Summit's property, which was reflected in the final plan as part of the "other lands" owned by Ms. Carter. The managing member of Reybold, Jerome Heisler, Jr., first became interested in those other lands around 2015 or 2016, with his initial intentions set on building a self-

---

[31] *Id.*

[32] *Id.*

[33] JX23.

[34] The 1983 deed to the developer references the final recorded plan. JX23. Each deed in the chain of title for Summit's property dating back to 1984 references the final plan within the description of the property being conveyed. JX55 at 13. Further, each deed in the chain of title for Summit's property from 1987 forward recites that the conveyance of the property is subject to all easements and restrictions of record. *Id.*

The plan is also referenced in Summit's title insurance. In 2018 and 2022, Thomas Mammarella, a Delaware attorney, issued two title insurance policies on Summit's property. JX36, 47; Tr. 168:14–17. Each policy required a title search through a title company, which "establishes a chain of title and then usually has a summary report indicating what the matters are that affect title to the property." Tr. 167:5–10. The list would include a copy of each of the listed encumbrances for counsel's review. Tr. 167:10–12. For Summit's property, Mr. Mammarella noted the "Notes, Easements and Restrictions" in the final recorded plan as an exception both times. JX36, 47.

storage facility.[35] During his initial review, he pulled the final plan for the Summit property and noticed the Note, which he read as an easement benefitting what is now Reybold's property.[36] Mr. Heisler testified he was familiar with that type of note from other record plans in his experience with Reybold and from being on the Route 40 steering committee for almost 25 years.[37] In his mind, the Note meant what is now Reybold's property had easement rights over the Summit property and there would be a single entrance benefitting both.[38]

Before Reybold purchased the property, Mr. Heisler approached Summit to discuss Reybold's plans, should it purchase the property.[39] Reybold first approached Summit "about working out the details of a note on the plan which indicated the possibility of an easement" in 2019.[40] Mr. Heisler and Summit representatives had numerous discussions, but Summit was not interested in working with Reybold regarding a cross easement.[41]

---

[35] Tr. 53:12–20. After further reviewing the site, Reybold realized there was more land available and expanded their plan beyond storage and to include a retail center. Tr. 66:10–19.

[36] Tr. 53:21–54:10.

[37] Tr. 54:20–23.

[38] Tr. 54:11–16.

[39] *See* Tr. 56:24–57:1.

[40] Tr. 224:3–14.

[41] Tr. 56:2–6 (Heisler), 224:23–225:1 (Perry). Summit's position in these discussions was that the easement would be burdensome to their tenants because "between 4:00 and 6:00 in the evening, it's almost impossible to leave that center and turn north, turn left and go north on Route 896. So [Summit] felt it was a safety hazard, and adding additional traffic

Yet, the parties nearly reached an accord through two creative proposals. First, Reybold offered to arrange for a traffic light at the entrance to Summit's property; an offer that was appealing to Summit to resolve some of its concerns.[42] But, after about six months, Reybold reported back that it was unable to get the traffic light approved by DelDOT.[43] Then, after a lull "for quite some time[,]" a Summit representative suggested that Reybold, or its affiliates, buy Summit's property to moot the issue.[44] But, ultimately, Mr. Heisler decided against a purchase because (1) "[i]it was an older site[ a]nd most sites today have their buildings sitting near the road, not in the back of the site for retail[;]" (2) he was not interested in problems associated with older buildings; and (3) he was not willing to pay the "premium cost" Summit appeared to be seeking.[45]

Despite the failed attempts to reach an accord with Summit, in 2020, Reybold moved forward with its interest and eventually closed on its purchase of what is now

---

to it only made the safety hazard worse. It also would create an encumbrance and problem with [Summit's] existing tenants." Tr. 227:4–14. Summit also believed there was no logical place for the easement because they would have to reconfigure their parking lot. Tr. 229:9–13.

Reybold introduced evidence regarding a direct or indirect principal of Summit's involvement with a plan termed the "Winner Plan." D.I. 55; JX26. I find this evidence irrelevant to the issue before me.

[42] Tr. 56:5–10 (Heisler), 225:13–19 (Perry).

[43] Tr. 225:21–226:3.

[44] Tr. 226:6–12.

[45] Tr. 232:12–233:3.

the Reybold property. The trial record does not include the final agreement of sale or closing documents but a draft "third amendment" to the agreement of sale provides some highlights.[46] It reflects that Reybold initially entered into an agreement of sale to purchase the property in 2017, which was amended twice before (in 2018 and 2019).[47] The third amendment noted Reybold's efforts to work with Summit on "development of the Cross Easement . . . but [that] such owner refuse[d] to participate in such discussions[.]"[48] In the third amendment, Reybold further indicated its intent to commence an action in this Court regarding such refusal.[49] And, as for timing, the draft third amendment included a plan to close in the Fall of 2020.[50]

The sale did close in the Fall of 2020. In addition to filing this action, which I will discuss in my procedural posture, Reybold has also, to some degree, moved forward with development. Reybold, through its engineer, has been working with Middletown since at least 2021.[51] Reybold's 2022 submission includes a plan depicting a proposed retail center and storage facility.[52] Mr. Heisler explained that

---

[46] JX41.

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *See, e.g.*, JX46.

[52] JX49.

11

the plan does not depict an interconnection between the Reybold proposed development and the Summit property; the Reybold plan was drafted as "stubbed to the property line."[53]  Mr. Heisler confirmed at trial that "the goal of this lawsuit [is] to make [the stub-out] an interconnection."[54]  But he attempted to distance Reybold from one reference on the proposed plan, which reads "cross access easement to be established under a separate agreement."[55]  Per Mr. Heisler, that reference was "incorrect."[56]  Although this plan remains in limbo, and Reybold has not secured final development approval from the Town Council of Middletown, Reybold has secured "[r]ights in, rights out" from DelDOT.[57]

## C. Procedural Posture

Reybold followed through on its promise, initiating this action on November 13, 2020.[58]  On July 21, 2021, I denied Summit's request for a pleading-stage dismissal.[59]  After some discovery, the parties proposed a schedule to have this

---

[53] Tr. 89:2–9.

[54] Tr. 89:2–12 (referencing JX49).

[55] JX49.

[56] Tr. 89:22–90:5.

[57] Tr. 57:14–58:1, 59:18–20.

[58] D.I. 1.

[59] D.I. 15. My order was adopted on August 17, 2021. D.I. 17.

matter tried in November 2023.[60] I granted their proposed schedule and set a two-day trial for November 8–9, 2023.[61]

Although discovery proceeded without incident, the parties teed up two pre-trial disputes. First, on September 20, 2023, Summit filed a motion *in limine* to preclude the testimony of two purported experts, both Delaware attorneys.[62] The motion was fully briefed, I heard argument at the October 27, 2023 pre-trial conference, and, during that conference, I granted in part and denied in part, the motion.[63] In that ruling, I found Reybold "served two expert reports that unquestionably contain legal analysis and conclusions[,] . . . each [of which] reads to me more like briefing from learned counsel than permissible expert analysis."[64] Nevertheless, I permitted each expert to testify regarding specific lines of inquiry and I have relied on that testimony as indicated herein.[65]

The second pre-trial dispute was about a trial subpoena issued to an assistant county attorney for the County. On October 30, 2023, the County's Law Department

---

[60] *See* D.I. 18–26.

[61] D.I. 27.

[62] D.I. 44.

[63] *See* D.I. 46, 49, 56, 62, 78.

[64] D.I. 78 at 26:6–10.

[65] *See* D.I. 78. In doing so, I also rejected the request to disqualify one of the experts as allegedly conflicted. *Id.*

moved to quash the subpoena.[66]  In response to my minute order directing a response to the motion to quash, Reybold released the subpoena.[67]

Trial proceeded on November 8, 2023, and finished without the need for a second day.[68]  Following our one-day trial, the parties submitted post-trial briefing, which was complete on March 22, 2024.[69]

## II.    ANALYSIS

The singular dispute between the parties is whether the Note reflects an easement that Reybold can now use.[70] I find it does, Reybold can, and declaratory relief should be granted. I decline, however, to award injunctive relief.

Before I turn to the various components of my analysis, I wish to highlight two overarching standards.  First, as recently recognized by Vice Chancellor Laster in *Buckeye Partners, L.P. v. GT USA Wilmington, LLC*, the existence of an easement must be established by clear and convincing evidence.[71]  Thus, Reybold bears the

---

[66] D.I. 57.

[67] D.I. 58, 63.

[68] *See* D.I. 65, 66.

[69] *See* D.I. 70, 73, 77.

[70] In framing the issue as such, I am intentionally sidestepping whether those owning the remainder of the "other lands" of Ms. Carter are entitled to similar relief. Such issue is not properly before me absent indispensable parties (the other property owners).

[71] 2022 WL 906521, at *2, *2 n.2 (Del. Ch. Mar. 29, 2022), *judgment entered*, (Del. Ch. 2022).

burden of proving, clearly and unmistakably, that the purported easement exists and inures to its benefit. I hold Reybold to that burden.

Second, in reviewing the Note, I am guided by contract principles. "Documents conveying an interest in land 'are specialized forms of contract, and like other contracts are not subject to construction unless the language is ambiguous.'"[72] Thus, only if the Note is ambiguous may I consider extrinsic evidence to construe it.[73]

Applying these standards I first address whether the Note effectively created an easement. Finding the Note was an express reservation of an easement, which was effective once the common interests were severed, I then turn to the nature of the easement. I find the easement is (and was once effective) appurtenant and the New Castle County Code does not sway me otherwise. That brings me to Reybold's requests for relief; I find Reybold entitled to declaratory judgment, but I decline to take the further step of awarding injunctive relief, under the circumstances.

### A. The Note reserved an enforceable cross-easement appurtenant, which was effective once the common ownership was severed.

Easements are non-possessory interests in land, which may be appurtenant or *in gross*. Here, Summit challenges whether an easement was created by the Note

---

[72] *Id.* at *30 (citations omitted).

[73] *Id.*

and the parties dispute, assuming an easement exists, the type of easement and who is entitled to enforce it. I take those matters in turn.

### 1. The Note effectively reserved a cross-easement.

Summit argues that Ms. Carter did not intend to create an easement and, regardless, the Note could not create an easement because Ms. Carter owned all relevant parcels at the time of creation. I disagree.

I start with the basics. "An easement may be created in any of several ways: by express grant or reservation, by implication, by necessity, or by prescription."[74] "No specific words are required so long as the writing clearly reflects the grantor's intent to create an easement."[75]

Summit is correct that, generally, one cannot create an easement with and for themselves; an easement, by its nature, contemplates one person using another's land for a specific purpose. But Ms. Carter expressly reserved an easement, through the Note, in connection with the impending subdivision and sale.[76] Once Ms. Carter sold the shopping center property to the predecessors in interest to Summit, the reserved easement was effective.[77] Thus, the cross-easement was expressly reserved by Ms.

---

[74] *Judge v. Rago*, 570 A.2d 253, 255 (Del. 1990) (citations omitted).

[75] *Black v. Staffieri*, 2014 WL 814122, at *2 (Del. 2014) (citation omitted).

[76] *See, e.g., Judge*, 570 A.2d at 257 n.1 (citation omitted) (tacitly acknowledging that an express easement can be reserved, even without "plan and direct" language).

[77] This holding is supported by Delaware case law regarding easements by implication. Those will not immediately arise from a single party who "owns two parcels of property

Carter on November 9, 1983 (the date the Note was recorded as part of the final plan) and became effective on September 20, 1984 (the date Summit's property was transferred from Ms. Carter to the original developer).[78]

Summit argues that the Note cannot be attributed to Ms. Carter because of her tacit role in the development planning process. I find this unpersuasive for two reasons. First, I must assess and construe the Note on its face and may only consider extrinsic evidence if it is ambiguous. The Note is unambiguous. It reserves an express easement and is signed by Ms. Carter as the owner of the property. Second, even if I did consider the planning process as I construe the Note, it would be insufficient to overcome the import of Ms. Carter's signature on the final plan. "The act of placing one's signature on a legal document, whether in writing or by a facsimile or stamp, is regarded as the most deliberate, conscious way that a person

_____

and uses one to benefit the other[.]" *Id.* at 258. Rather such use reserves a quasi-easement, which becomes, once the property is conveyed, "an actual easement appurtenant to the land [the prior owner] keeps, even if the conveyance is wholly silent on the question of easements and even if the easement is not absolutely necessary for the enjoyment of the retained property." *Id.* This implication has been enforced "because the knowledge of this use is presumably available to both parties to the agreement, and therefore constitutes powerful evidence of their intent." *Larsen v. Lobiondo*, 1994 WL 30538, at *9 (Del. Ch. Jan. 13, 1994) (citation omitted). Here, Ms. Carter expressly reserved an easement through the Note, rather than through usage, reflecting her clear intent and providing notice to successors in interest on both sides.

[78] I am not the first judicial officer of this Court to find an easement reserved in a recorded plan. For example, in *Green v. Templin*, Vice Chancellor Parsons enforced an easement reflected in a recorded subdivision plan from 1974. 2010 WL 2734147, at *16 (Del. Ch. July 2, 2010).

may manifest his intent to consent to, and be bound by, the terms of that document."[79] Here, Ms. Carter certified in the final plan that it was made at her direction; such is conclusive, binding, and cannot be overcome by the proffered extrinsic evidence.

## 2. The cross-easement is appurtenant.

Summit further argues that even if there is an easement, it can only be enforced by the County. I disagree; the Note reserved, and the transfer effectuated, an appurtenant cross-easement for the benefit of the landowners.

Easements can be appurtenant or *in gross*. "The former, as the name implies, form a part of the properties and run with the land; the benefit of an easement *in gross*, conversely, is personal to the grantee."[80] Digging deeper, "[a]n easement appurtenant includes a dominant tenement that is benefitted and a servient tenement that is burdened. . . . Conversely, an easement *in gross* involves only the servient tenement, which is burdened by the personal property interest of an easement holder."[81] Should the easement at issue not fit neatly within one of these boxes, "[t]here is a public policy favoring the construction of easements as appurtenant rather than *in gross* when they could reasonably be construed in either category."[82]

---

[79] *Parshalle v. Roy*, 567 A.2d 19, 27 (Del. Ch. 1989).

[80] *Coker v. Walker*, 2013 WL 1858098, at *5 (Del. Ch. May 3, 2013) (emphasis added).

[81] *Tubbs v. E & E Flood Farms, L.P.*, 13 A.3d 759, 768 (Del. Ch. 2011).

[82] *Id.*

18

The Note has all the key characteristics of a cross-easement appurtenant. It reflects both tenements (Summit's property v. the "other lands") will be benefitted by the burden to the other. The easement does not create any interest that can be divorced from ownership of the land at issue. Such is the nature of an easement appurtenant.

Summit attempts to argue otherwise by pointing to the drafting history of the Note. But, because I find the Note is not ambiguous, it would be inappropriate to consider extrinsic evidence to construe it. Nevertheless, even if I considered the referenced drafting history, I would still find the easement to be appurtenant. The drafting history shows, at most, that DelDOT asked for the Note to be included in the final plan. The involvement of this third party does not conclusively take the easement out of appurtenant land and into *in gross* land. And any uncertainty it may add is not sufficient to overcome public policy in favor of appurtenant easements, over easements *in gross*. It remains true, and proven, that Ms. Carter executed the final plan, which expressly reserved an easement in contemplation of a future sale, setting forth *in rem* interests. The cross-easement runs with the land.

### 3. The New Castle County Code does not alter this analysis.

Summit seeks cover from this holding through a strained interpretation of the New Castle County Code. Summit urges me to ignore the plain meaning of the Note,

19

as interpreted above, by characterizing it as a notation under the predecessor to Section 40.31.810 of the New Castle County Code, which, in 1983, provided:

> The provisions of this chapter, pursuant to which a record plan has been approved and all notations appearing on a record plan, other than those pertaining to certificates of occupancy, when the record plan is duly recorded, shall have the effect of restrictive covenants and shall run with the land covered by the record plan against the owners who have executed the record plan, their heirs, successors and assigns and in favor the county council until the record plan is amended or superseded; provided, that the right to enforce such covenants shall lie exclusively with the county council and the fact that several parcels belonging to different owners are similarly restricted or that a restricted parcel is divided among several different owners, shall not imply the creation of any private property or contract rights, on account of reliance or otherwise, among or between such several owners.[83]

Simplified, this section of the code clarifies that "notations" added by the County are restrictive covenants that may only be enforced by the County. As further support, Summit points to *Greylag 4 Maintenance Corp. v. Lynch-James*.[84] Therein Vice Chancellor Noble found, on a motion for summary judgment, the New Castle County Code provided the Council with "exclusive responsibility to enforce the notes appearing in record plans" and "[t]he terms of the County Code itself preclude [anyone else] from seeking to enforce it and eliminate any contention that there is an implied right of action to file suit."[85]

---

[83] D.I. 9, Ex. A.

[84] 2004 WL 2694905, at *9 (Del. Ch. Oct. 6, 2004).

[85] *Id.* (quotation marks omitted).

I find *Greylag* distinguishable and the code irrelevant. First, I have interpreted the Note under contract-interpretation principles and find, by clear and convincing evidence, that it expressly reserved an easement for the benefit of the landowners. This finding distinguishes the Note from "notations" contemplated in the code and the note at issue in *Greylag*.[86]

I reiterate my recognition at the pleading stage that there is nothing in the code expressly limiting a property owner from including her own notes in a plan and nothing that precludes using such notes to establish, preserve, or memorialize an express easement. The code clarifies that this provision is "not intended to replace any deed restriction, covenant, easement, or any other private agreement on the use of land."[87] The County will not enforce those private restrictions and "shall only enforce provisions that are required by" the code.[88] Here, Summit asks me to ignore these limitations, adopt a hyper-technical reading of the code and final plan, and in turn, ignore the clear reservation of an easement appurtenant. Such is unsupported by the authorities provided and would be inequitable.

---

[86] The note before the Vice Chancellor related to maximum square footage of any building "per off. of state fire marshal." *Id.* at *8.

[87] New Castle Cty. C. § 40.20.410.

[88] *Id.*

21

## B. Reybold is entitled to a declaratory judgment.

Reybold is entitled to declaratory relief that the cross-easement is appurtenant and inures to its benefit. "By statute, Delaware courts have jurisdiction to issue declaratory judgments."[89] "Declaratory judgment is 'designed to afford relief from uncertainty regarding rights' and is routine in actions involving property rights."[90] Here, the Court should issue declaratory judgment in Reybold's favor to clarify the earlier uncertainty regarding the Note and Reybold's easement rights.

## C. Injunctive relief is not warranted.

Reybold has not, however, demonstrated entitlement to injunctive relief. A party seeking permanent injunctive relief "must show: (1) actual success on the merits of the claims; (2) that the plaintiff will suffer irreparable harm if injunctive relief is not granted; and (3) that the harm to the plaintiff outweighs the harm to the defendant i[f] an injunction is granted."[91] Proof of these three elements is by "the preponderance of the evidence,"[92] which requires evidence making something more likely than not.[93]

---

[89] *Paul v. Rockpoint Gp., LLC*, 2024 WL 89643, at *8 (Del. Ch. Jan. 9, 2024) (citing 10 *Del. C.* §§ 6501–6513).

[90] *Capano III v. Draper Subdivision Ass'n.*, 2019 WL 3938704, at *9 (Del. Ch. Aug. 20, 2019), *judgment entered*, (Del. Ch. 2021) (citations omitted).

[91] *O'Marrow v. Roles*, 2015 WL 5714847, at *11 (Del. Ch. Sept. 30, 2015).

[92] *Rosenbaum v. CytoDyn Inc.*, 2021 WL 4775140, at *13 (Del. Ch. Oct. 13, 2021).

[93] *See Del. Exp. Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002).

I have already found that Reybold should succeed on the merits of its claim—that an easement appurtenant does exists for Reybold's benefit. But Reybold has failed to establish that it will, more likely than not, suffer irreparable harm absent injunctive relief. I find as much for three primary reasons.

First, this is not a case where the servient estate is actively interfering with the attempted exercise of easement rights. For example, in *Rowe v. Everett*, the servient estate erected barriers to prevent use of the easement and the dominant estate owners sued for injunctive relief.[94] On summary judgment, then-Master Glasscock found an easement had been established and ordered injunctive relief to stop the active interference. Here, there is no active interference, which I could order abated through permanent injunctive relief.

Second, the request for injunctive relief is prospective, yet unsupported by any indication that Summit will fail to respect a judicial declaration. "[I]njunctions against future wrongdoing are generally unavailable. Instead, the court presumes 'that parties will respect any decision rendered by any competent court of this State.'"[95] But, "a court of equity may properly issue an injunctive order where there

___

[94] 2001 WL 1019366, at *4, *7 (Del. Ch. Aug. 22, 2001).

[95] *In re COVID-Related Restrictions on Religious Servs.*, 285 A.3d 1205, 1233 (Del. Ch. 2022) (citing *Young v. Red Clay Consol. Sch. Dist.*, 2017 WL 2271390, at *53 (Del. Ch. May 27, 2017)).

is reason to believe that a defendant will resume his wrongful course of conduct."[96] Here, the requested injunctive relief is not supported by any competent evidence that Summit will, in the face of a binding order that an easement appurtenant exists, nevertheless preclude Reybold's use and enjoyment thereof.

Third, and finally, the request for injunctive relief is nebulous and is better addressed, in the first instance, through meet and confer efforts. Sure, it would seem simple to order that Summit permit use of the cross-easement. But there may be multiple ways for that to occur, and rather provide an uninformed judicial decree, I find the parties should meet and confer and attempt to reach a resolution. The Court remains available should those efforts fail, and relief become necessary.

## III.  CONCLUSION

For the foregoing reasons, I find the Note reserved a cross-easement appurtenant, enforceable by Reybold (and Summit). Reybold is entitled to declaratory relief to that effect, but is not entitled to prospective, unsupported injunctive relief.  This is my final report, and exceptions may be filed under Court of Chancery Rule 144.

Respectfully submitted,

/s/ *Selena E. Molina*

Magistrate in Chancery

---

[96] *Weiner v. Miller*, 1990 WL 54915, at *1 (Del. Ch. Apr. 27, 1990) (citation omitted).

24